# ROBERT E. KETRENOS
*v.*
# DEPARTMENT OF REVENUE

Frank V. Langfitt, III, Fellows, McCarthy, Zikes, Kayser & Langfitt, P.C., Portland, represented plaintiff.

James D. Manary, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiff rendered December 16, 1977.

CARLISLE B. ROBERTS, Judge.

The plaintiff, Robert E. Ketrenos, appealed from the defendant's Order No. VL 76-780, dated February 15, 1977, respecting the true cash value of certain lots, each of two acres or slightly more, identified in Defendant's Exhibit C as Assessor's Account Nos. 1-08-4225-10-1400, 1-08-4225-10-1500, 1-08-4225-10-1600, 1-08-4225-10-1700, 1-08-4225-10-2100, 1-08-4225-20-100, 1-08-4225-20-300, 1-08-4225-20-400, 1-08-4225-20-500, 1-08-4225-20-600, 1-08-4225-20-700, and 1-08-4225-20-1100. These 12 two-acre lots are part of a subdivision known as Garden View Estates, located near Warren, Oregon, between the cities of Scappoose and St. Helens, in Columbia County. The

Columbia County Board of Equalization found a value as of January 1, 1976, for the tax lots as follows: Tax Lots 300, 500, 600, 1100, 1400, 1500, 1600, and 2100, at $4,000 each; Tax Lot 100, $4,060; Tax Lots 400 and 700, $5,800 each; and Tax Lot 1700, $1,200. The petitioner contended before the department that the properties had been denied septic tank permits and, therefore, were not marketable. It was his opinion that the assessed value of the 12 lots could properly be averaged at $500 per lot, for a total of $6,000.

The Department of Revenue concluded that each of the lots, except Tax Lot 1700, had a true cash value of $3,430. Tax Lot 1700 was on the tax roll at $1,200 because it is essentially a swampy pond and this value was affirmed.

Mr. Ketrenos, formerly a resident of Columbia County, purchased the land which was subsequently developed into the Garden View Estates in 1969-1970, expecting to farm it, but, after one or two years, he decided it was a proper subject for development as residential property. He filed a plat in regular form before the Department of Environmental Quality had begun to establish sanitation standards in addition to those of the county. Nevertheless, at that time, 18 of the original 30 lots were restricted with a notation on the plat that the specific lots were not to receive septic tank permits. Three lots which had originally been given approval have since been denied permits. The 12 subject lots have all been denied septic tank permits.

Of the original 30 lots, only the 12 under appeal have not been sold. Ten of the 18 lots that have been sold had septic tank approvals at the time of sale. (The approval for one of these lots was subsequently withdrawn.) Eight lots have been sold without septic tank approvals.

The plaintiff testified that, in each instance, the eight lots without approvals were sold to adjacent property owners or relatives of adjacent property owners who had been able to build a residence. Thus,

these were not sales which were typical of the open market, because they were bought by members of a limited class who were simply enlarging their estates around an existing residence upon property approved for building by the county sanitarian. (The only exception to this general statement was one sale of three lots where the original purchaser resold the lots with a sanitary easement through adjoining land owned by his parents, situated outside the borders of the development.)

During the last two years, plaintiff has been a licensed real estate broker (and also a "certified commercial investment real estate broker"). He is basically knowledgeable as an appraiser and in the development of property. He still owes $35,000 on the land sale contract through which he purchased the original tract and is paying interest thereon. Although the remaining lots are really not suitable for farm purposes, plaintiff has been able to obtain $360 a year during the last two years by having a local farmer harvest the hay. His testimony is replete and uncontradicted that he has touched upon every possibility to sell the 12 lots under appeal. The last sale of a lot by him was made in August 1974. Several sales have been negotiated but, since each sale was contingent on septic tank approval, he has had 20 failures, requiring the return of earnest money paid. He has tried to combine several lots in order to obtain permits, but each attempt has been denied. Local realtors have given up trying to make sales. He has tried to trade the property without avail.

Plaintiff recognized that in years to come there could well be regional sewer systems to serve this and other surrounding residential developments (for which, generally, there is a good market in Columbia County), but any of the subject lots can be expected to be purchased only as a long-term speculation. He believed an investor, if any were found, would not have regarded this as a good speculation as of January

1, 1976. Possibly, in 15 or 20 years, with the development of regional sewers, the subject property can be broken into quarter-acre lots and sold. At this time, and as of January 1, 1976, there is and was no demonstrable market for the property.

The defendant's witness, Mr. Henry T. Hudson, the county assessor and former chief appraiser for the county, presented a careful study of 18 sales of "sanitary rejects," five of which were located in the Garden View Estates (sales which had been described by the plaintiff, none later than 1974). Two were sales of rural tracts. The remaining 11 sales were of smaller lots in the View Crest, Meadow View, Firlok Park, Glen Cove and Columbia Acres subdivisions. It appears that all but three of the sales were to an owner of adjacent property who had already been able to build a residence. Of the three sales that were not made to adjacent owners, one was a totally noncomparable sale of over eight acres located on the other side of the county for which a septic tank permit was subsequently obtained. The other two were sales to a single broker who is attempting to accumulate lots in Columbia Acres, where it is possible to combine lots and obtain a septic tank permit.

This is a significant factor. Mr. Hudson indicated that speculators will buy *some* sanitary rejects where the property has been subdivided for residential purposes, paying substantial values per acre. However, Mr. Hudson testified as to only one broker who is accumulating lots in a subdivision where it is possible to combine lots in order to obtain a septic tank permit, which has proved impossible with the subject lots. Further, Mr. Hudson stated that the market for "sanitary reject" properties is quite limited and the main element in that market is adjoining property owners. Mr. Hudson deemed his sales from the subject subdivision to be the most significant he had to produce. But note that each of those sales had as purchaser a person who was able to maintain a present residence without the requirement of a further septic

tank permit (with the exception of the party who effected the same result through a sanitary easement over adjoining property). In the court's view, this evidences the failure of the witness to perceive the significant fact that the market of adjacent owners in Garden View Estates, of which there were only nine, was exhausted, having been saturated with the sale of nine lots without sanitary approval.

■ The preponderance of the evidence leads the court to conclude that the subject property, above described, platted in 12 lots of two acres or more, is not presently salable and will remain so unless and until there is a substantial change in the area. ORS 308.205 provides:

> "* * * With respect to property which has no immediate market value, its true cash value shall be the amount of money that would justly compensate the owner for loss of the property."

The best evidence of just compensation before the court is the plaintiff's testimony that the total value of the 12 lots, including Tax Lot 1700, should be placed at $6,000 as of January 1, 1976.

The defendant's Order No. VL 76-780 shall be set aside and the County Assessor and Tax Collector of Columbia County, Oregon, shall amend the assessment and tax rolls for the tax year 1976-1977 to show a total true cash value for the 12 lots of $6,000. Plaintiff is awarded his statutory costs and disbursements.